You must be Mr. Ball. I am, your honor. You've got 25 minutes on the clock. You understand how this works. We have 10 minutes, 15 minutes for the state and 10 minutes for the United States. You can use your time as you wish. I'd like to save about 7 minutes to revise. Whatever is left on that clock... When I'm done? You can sit down. Now you have 25 minutes left. I don't think I'll do that, your honor. Oh, I'm just saying, for an example. You may proceed. May it please the court, my name is Frederick Ball, and I represent the National Association of Chain Drugstores and the National Community Pharmacy Association. We are here once again because the state materially reduced payments to Medi-Cal providers without complying with the procedural requirements of Section 30A of the Medicaid Act. As repeatedly instructed by this court over the last two years. For the last two years, pharmacies have been before this court because of a 10% cut. Then they were before this court because of a 5% reduction. Numerous other providers... No, it's 4%. It's getting better. Well, except, your honor, that it's still below cost, according to Dr. Schaefer-Meyer. And in fact, according to the state, for brand name drugs, it's below cost. So it's not getting better, your honor. It's still affecting. And again, they did not do the studies that this court has repeatedly said that they have to do. Are your clients required to participate? I'm sorry, your honor? Your clients are required to participate? Are our clients required to participate in the Medi-Cal program? Yes. They are not required to participate in the Medi-Cal program. So if they're losing money, you know? They are losing money, your honor, but at this point... They could just get out, no? They could get out, your honor. But at this point, we don't have to show that. Because it's the state's burden to show that there is appropriate access and quality of care. And this court has repeatedly said, as recently as March 3, 2010, in California Association v. Maxwell Jolly, which we refer to in our briefs as California Pharmacy Association... So you're standing in here for the Medi-Cal recipients? No, I'm standing in here for the Medicaid providers, which this court has repeatedly said have standing to raise these issues. There's no question that they have standing to raise the Supremacy Clause issues. That was decided in the very first appeal in the California pharmacists' – in the very first appeal of these issues on the 10 percent rate cut, isn't it? Yeah. There's a difference, isn't there, as the court below suggested, between California authorities simply saying, tomorrow the reimbursement rate will be 10 cents for this kind of service, versus a market fluctuation, for example. If your salary – if your profits go down because the market has crashed, obviously California doesn't have to – that's something you simply have to take, versus something that the state does itself. Fair to say? Well, first off, Your Honor, we don't – the state did do something here. On September 26, 2009, it reduced payments to Medi-Cal providers. It did so based on a formula which hadn't changed. The formula remained the same. What had changed was the Massachusetts litigation. That is correct, Your Honor, but let's talk about the Massachusetts litigation and whether the formula matters. First off, in Dominguez – in the Dominguez case, the other case that this Court decided on March 3, 2010, this Court said that the formula – merely changing the formula is not the trigger. This Court said that reduction in payments are what matter, and the reason it matters is because payments are what assure access and quality of care. So merely – I'm sorry, Your Honor. But this is changing payments based, in part, on a lawsuit that suggested that what the payments had been keyed to was collusive. Your Honor, that – the lawsuit settlement involved 1,442 drug products. The reduction in payments on September 26, 2009 involved 18,000 drug products. So they cannot tie it simply to that lawsuit. It involved – and they do not simply because there is a change in the formula, Your Honor. There's not – there was a change in the formula for an additional, Your Honor, because they've delegated to First Data Bank to determine what average wholesale price is. The formula is set forth in the State statute as average wholesale price minus 17 percent. The State never defines what average wholesale price is. The State has looked to First Data Bank to define what average wholesale price is. And every court that we've been able to find, Your Honor, where the State has delegated to a private contractor for the determination of one of the components of the Medicaid program, the courts have questioned whether that's constitutional, if they are solely going to rely on that. It does not relieve them of their responsibility for assuring the payments meet the requirements of Section 38. And when there's a material reduction, like there was on September 26, 2009, they have to do the studies that this Court has mandated. And you say that it was not – the Massachusetts – the collusion requirements were only as to, what, 1,000 or so products. And First Data Bank then decided on its own to settle with respect to a larger number of listed products. But what had triggered this reduction was a concern that First Data Bank had been colluding with the pharmaceutical providers. Isn't that fair to say? It is fair to say that Judge Saris found that there was at least a possibility – she never made a ruling on that particular issue. Because the case settled. Right. Because the case settled. That there was collusion between the pharmaceutical providers and First Data Bank, at least with regard to those 1,440. So this – so that your reimbursement was reduced because of a factor external to anything that the State did or didn't do. Well, I disagree with that, Your Honor. First, I was reduced because they rely on First Data Bank, and they made the decision to rely on First Data Bank to provide this information. There's nothing in the statute that says they have to select First Data Bank. There are numerous other providers of this information out there. Second, Your Honor, the payments – the State is the one that reduced payments. And as we pointed out in our papers, under Shelley v. Kramer and under Railway – the Railway case, that's State action. Any actions that the State takes – I don't think anyone is suggesting it's not State action. The question is whether it's State action that triggers the kind of cost study that was required by Orthopedic Hospital prior to doing it. Well, Your Honor, in Orthopedic Hospital, this Court italicized payments. It italicized the word payments in California Pharmacists Association. And it italicized payments and numerous other of the reimbursement cases that have been in front of it in the last 18 months. And the reason is quite obvious, because payments are what matter. But if the market crashed in some respect, and we're talking about sort of external factors, not something that they did or didn't do, an external factor, the First Data Bank settlement, the external thing that could have been the market, you're not saying that California has an obligation to do a cost study any time that there's any kind of even market fluctuation that would result in a reimbursement? Not, Your Honor. This was not a market fluctuation. Right. But I just want to get the scope of it. So clearly there are cases that say that when the State does something directly, sets rates, has to be a cost study. And then there's market fluctuations in which they don't. This is somewhere in between. Well, one, it's not a market fluctuation, first off. And it covered 18,000 drug products, which represents 70 percent of reimbursement to Medi-Cal pharmacy providers. So it's – and the difference here is, Your Honor, is when it reduced it by 4 percent, there was no concurrent reduction in cost. When you're talking about a market crash, Your Honor, there would have been a concurrent reduction in cost to pharmacies. The problem here is that there was no reduction in cost to pharmacies. And the – we should go back. What if they had decided, we've just done the math wrong, and whoopsie, from now on in we're going to do the math differently? Do they have to give you a notice of that? They go through and they find, you know, those are some mathematical calculations. These things are – do they have to give notice of math error? Well, Your Honor, everybody was relying on the math that they were using. They were using wholesale acquisition cost times 1.25 to calculate average wholesale cost. Is there a yes or a no to my question? There is a yes if it made a material difference in reimbursement to pharmacies. Well, yeah. No, they made a mistake. They just left off a zero. They divided it by 4 instead of dividing it by 3 or something. And, of course, it made a difference. Now, they're not going back. Are they going back and trying to recoup past costs too? They are not, Your Honor. Okay, so they say, okay, forgive, you know, you made extra money in the past because you made a math error, but we're not going to keep making the same math error in the future. And you think for that you need – I can see about the past. You say, look, we rely on it. We, you know, we get discounts, you know, whatever, based on what, you know, and so you want to go back and recoup. We rely on the math error, but how can you rely on the math error in the future? Well, we're not relying on the math error in the future because the formula is not what matters. What matters is the combined – is the payments that they're making to pharmacies. But you just said that it had to have made a material difference. I just want to – I want to bring this conversation back to a preliminary injunction for a moment. So you say it had to have made a material difference. 1 percent wouldn't have been a material difference. 4 percent is a material difference. So then the question is, in a preliminary injunction, is the distinction between 4 and 1 or 6 sufficient to enjoin the implementation, or is exactly – or isn't that exactly what the trial ought to be about? Can you say that you have a likelihood of success on the merits with respect to your claim that can't implement this without a cost study, when the question is, well, maybe some can be and some can't be? Isn't that just what the litigation should be about without an injunction? Well, Your Honor, I would point out that a 1 percent reduction probably would be considered material, and let me explain why. When the Secretary promulgated the rules on whether or not you had to promulgate a State plan amendment, there was a proposal by commentators that she limited to a 1 percent reduction. I'm sorry. I don't remember whether the Secretary was a man or woman at the time that promulgated the rules. And there was a question as to whether a 1 percent reduction. And the Secretary rejected that, saying that it could – that less than 1 percent could quantify as a material reduction. In this case, it was clearly material, Your Honor. I don't think there's any question. And, in fact, we know it's material because the district court herself found that there was irreparable harm to pharmacies. Now, she truncated her analysis improperly by not considering the sliding scale analysis, but she found in a footnote that there was clearly irreparable harm to pharmacies. There's irreparable harm, and she was very concerned about that. She said, clearly, that's got to be a material change. But the question I have is when, if we agree with you, does the State have to make a study? Do they have to make a study every time there's some change, or are they permitted to wait back and see what's going to happen? Well, Your Honor, this Court has said that, no, they're not permitted – I'm going to answer the first part of your question. All right. The second part of your question. This Court has consistently said they're not allowed to wait back and see what happens. That's what the Seventh Circuit has said. They are allowed to put out whatever price they want and see what happens. That's not the law in the Ninth Circuit. With regard to if any time there's a change, no, that's not the argument we've made. That's what the State claims we're making, and that's what the Federal Government claims we're making. They're claiming that any time the market fluctuates, they would have to do a study. That's not what happened here. There was a 4 percent reduction across the board in reimbursement and price in the past. The cost to pharmacies did not change. It covered 70 percent of reimbursement for 18,000 drug products. The 70 percent – you know, is 10 percent material, Your Honor? If it only affected 10 percent of drug products, that may not have been material. It covered 70 percent of reimbursement, and Dr. Schaefer-Meyer's report demonstrates that they are now being reimbursed below cost by $2.99 for every – for every brand-name drug that they dispense to a Medi-Cal recipient. That's the material change. Kagan. So the extent of the irreparable harm, if you want to get to that prompt for a moment, is contested. And the State could well say that if we had to conduct a cost study, every time there is a fluctuation of – the formula stays the same. We didn't do anything. It's a formula that had been approved as to what people had noticed. Every time that there is some kind of change in the component parts of that formula, we have to do a cost study because someone might consider it to be material. It will have consequences, administrative costs to us as well as all sorts of other costs to us. Why isn't that – why doesn't that balance out the harm to the pharmacies here? Well, first off, Your Honor, in Dominguez v. Schwarzenegger, they made the argument that it would be impossible for them to do these types of studies, and this Court rejected that. They said it's their responsibility, because they have a responsibility to ensure access and quality of care. But that's, again, you don't think that there's a distinction in terms of the State's obligation between instances when it directly sets a reimbursement rate versus a situation in which a formula that it has established, the component parts of the formula have different application because of something they didn't do at all. I don't think there's a distinction between the two at all. Well, Your Honor, that was rejected by this Court in Dominguez v. Schwarzenegger where this Court said that simply because the State does not change its methods and procedures for calculating payments, but when payments change, that's what matters. And here, Your Honor, again, we're not dealing – we're not in here claiming that every time there's a market fluctuation, because there it's tied to the market. There, when AWP goes up or goes down, the costs to pharmacies go up or go down. But there's – isn't this different than all the other cases that you cited? Because here, there is a class action settlement in Massachusetts. It had been approved by a district court judge. It's been affirmed by the First Circuit. You have a finding by the Secretary which, although it's not entitled to direct deference under Chevron, we should consider that this is not a problem, that this is appropriate and States don't have to do anything further in the light of the Massachusetts settlement. Doesn't that, at least for preliminary injunction purposes, suggest that there are equities on both sides? Well, First Your Honor, I would not agree that that's what Secretary Sebelius  said. What Secretary Sebelius said in her letter is that she was not going to require the States to do any particular thing. She went on to state, though, that was because the States had an ongoing responsibility under the Medicaid Act to assure that they were complying with the Act. And in the Ninth Circuit, in order to comply with the Act, when they make a change in payments, they have to do these types of studies. Now, Your Honor, with regard to the settlement, the settlement was for 1,442 drug products. We have ten times that number that were changed on September 26, 2009. If it had been 1,442 drug products, which, you know, doing the math in my head would have represented 7 percent of reimbursement, would we have been able to go in front of the district court on a preliminary injunction? I don't know the answer to that off the top of my head. I do know when it represents 70 percent of reimbursement and puts them below cost of almost $3 on every drug that they dispense, according to our expert, and is recognized by the State, puts them below cost for brand products on every drug that they dispense. That is a material change for which they have to do the type of studies under Ninth Circuit law. Well, let's assume they do the study, but it takes a couple of years to do the study. You say, as opposed to studies, turns out to be against you, that everything is fair with this change, you say that now you are entitled to a preliminary injunction because you may lose money during the time the study is taken. Is that correct? That is correct, Your Honor, because this Court has consistently said that the State must do these studies prior to implementing the change. And I think I already made the statement that you cannot go back and then reclaim the profits you might have made, assuming that the study says you're right. Well, Your Honor, they've not made any. There's no argument that they've even attempted to recover. I don't think that's even a question here, Your Honor. I don't know whether they could recover it or not recover it. But what this Ninth Circuit has consistently said, and they said in California Pharmacists Association, they reiterated it and italicized the word in Dominguez, and they said it in an orthopedic hospital, is that the State must do these studies prior to implementing the change because of the State's responsibility to assure that it is complying with the Medi-Cal Act, with the Medicaid Act, sorry. Dominguez was a change in statute, right? Dominguez involved a change in the State's percentage, a change in the statute involved a change in the percentage that it was going to contribute. Which was a little different from what you answered Judge Gertner. If I recall correctly, it changed when she asked you, the formula stays the same, but some external factor changes. And you said, yeah, even then you have to do a study. Dominguez says that. I'm looking at Dominguez. I don't think it says that. Well, Your Honor, Dominguez, if you have Dominguez? I do have Dominguez, Your Honor. I have Dominguez right here. And if you can tell me where you're looking. I mean, Dominguez was a statute, right? So the State actually went ahead and changed the formula. That's incorrect, Your Honor. The State did not change the formula. Because the formula for reimbursement was set by the counties in Dominguez in their negotiations with the health care providers. So what did the statute do in Dominguez? The statute did in Dominguez was it changed the percentage of contribution that the State government was going to make to the counties. What it effectively did is the State was contributing $12. It was saying we will contribute a certain percentage up to $12. And I don't remember exactly the cents amount, Your Honor. And they changed that. They basically locked about $2 off and said we'll contribute a certain percentage up to $10 and something. The exact calculation of what people were paid for providing these home health services was determined by the county in their negotiations with the providers. That's the formula. And what the Ninth Circuit said is it's the payment. Yes, you did not change the methods or procedures for determining the payments that were going. But it had the effect of reducing the payments because the counties are not going to make the vast majority of counties are not going to attempt to make up that difference between what you were contributing and what you are now contributing. And therefore, you had to do this because the effect was a reduction in payments. Well, I'm still listening to try to figure out how this is analogous to our case. How to what, Your Honor? This is analogous to our case. It's analogous, Your Honor, because the Ninth Circuit said that it is payments that matter. And the Ninth Circuit said specifically. No, what it said was is you're changing one of the inputs in the formula. And if you're changing one of the inputs in the formula, that is affected. The formula didn't change, but one of the inputs did. And what they were enjoying is changing the inputs. This would be tantamount to saying that they could not change the average price. However, it was said that that company couldn't change the average price based on the settlement. Well, Your Honor, I would point you to page 3375 in the slip opinion. That's section A of the opinion. Okay. I got it. Where the State makes the argument, however, section 123. I'm at A. However, merely lowers the State's contribution towards wages and benefits set by the counties. We are not persuaded by the State's argument, but the State's attempt to distinguish its rate of reimbursement requires from its contribution to the amount counties pay provided in the IHSS. Because by limiting its contribution of the non-federal share, the State injects itself into the collective environment. You're skipping around. I'm sorry, Your Honor. I am skipping around. How am I supposed to follow you? Sorry. You could say something like skip, skip. Okay. I'll say it. This is what we call presenter quotes, you know. I can say ellipses, Your Honor. You could say ellipses. I can say ellipses?  Your Honor, if you keep reading like it was one sentence. Okay. This was where the State made the argument. I bet you everybody was fooled. They thought it was one sentence. This is the pair. These are the two paragraphs where the State made the argument in Dominguez that it did not change the formula. It did not change the rates and procedures or the methods and procedures for determining benefits. But it changed one of the inputs of the formula, and that's what changed. It did it as opposed to a third party. Yeah. But this is a third party upon which the State relies, and the State can't delegate that authority and then wash its hands. It's an example. But, one, again, I keep on going back to it being a preliminary injunction. And if either prong of this, if the likelihood of success on the merits, and here the merits would be your claim, a study is required before you implement this change. If there's any ambiguity about that, then you lose on that prong. One can say that the district court below is wrong in categorically saying no study was required. But there's certainly your saying, yes, a study is required. There's an intermediate position that says, we don't know. We're going to have to litigate this. This doesn't look like any of the other cases before us. And if there's any ambiguity in this, you don't get a preliminary injunction. Well, Your Honor, that's the analysis that the district court did, which was an incorrect analysis because the district court truncated it and never considered the irreparable harm prong. And the district court did that under Global Horizons, which is an incorrect analysis because the district court did not find that we had no chance of success on the merits. And at that point, the district court had to determine whether or not we had irreparable harm and had to look at a sliding scale. And the district court herself in a footnote found that if she had to consider the irreparable harm prong, that the granting of the preliminary injunction would have been a much closer call. She didn't do that analysis. She improperly truncated it. And the correct analysis is under this Court's analysis in Greater Yellowstone, which says it's a sliding scale analysis in the Ninth Circuit. We have two and a half minutes left. Do you want to save that? I'll save that, Your Honor. Okay. We'll hear from the States or the United States, whoever wants to go first. Good morning, Your Honor. I'm Ismail Castro with the California Attorney General's Office of Resilient State Democracy. You're presenting the litigious Mr. Schonassenegger? Yes, Your Honor. He just shows up in all of our cases. Your Honor, I appended to the amicus brief of the United States in this case. Counsel, would you please speak up? Appended to the — sorry, Your Honor. Appended to the brief of the United States, the amicus brief of the United States in this case is a decision that came from the State of Washington by District Judge Richard Jones. And on page 13 of that decision, he notes that the Chain Store Drug Store Association has acted on many fronts in bringing these types of claims with respect to the 4% or rollback of the AWP. And the Chain Store Associations objected to the settlement in the Massachusetts case and approval of the first databank settlement in the New England Carpenters case. And in objecting to the settlement, they are basically attempting by filing these types of actions in various forms to derail the settlement process. The appellants in this case are identical to the parties in the Massachusetts case? They were objectors to — they had standing to object to the Massachusetts settlement because they were directly affected by the 4% rollback. But they're arguably objecting under a different standard. In other words, what they're saying is their objections here are key to Ninth Circuit law and unique to California. What they're raising are Supremacy Clause claims that are permitted under the Ninth Circuit rule that allows them to bring a claim, even though such similar claims are not available to them under a 1983 cause of action. They raise a preemption under the Medicaid Act without providing any kind of analysis as to how preemption applies in a case like this. There certainly isn't any kind of legislative analysis that would indicate that Congress intended expressly or otherwise to preempt this field under the Medicaid Act. So we have that claim that's before the district court. In their request for injunctive relief, it's important to, I think, discuss the correct legal standard. The correct standard under review before this court is abuse of discretion. One of the prongs that this court is to look at is to whether the district court applied the correct legal standard. Judge Snyder applied the correct legal standard. She indicated that there was a requirement that the petitioners establish a likelihood of success on the merits, and if they failed to do so under Global Horizons, that she need go no further. I researched Global Horizons again. I read it over and over again. Justice Wallace's decision in that case is perfectly correct. It's the rule under this circuit. Judge Snyder found that there was no likelihood of success on the merits, reading the language of the statute. We always have to go back to the statutory language under 30A of the Medicaid Act to determine whether, in fact, the petitioners in this case have any kind of cause of action. The petitioners make, or I should say the appellants make the argument, for example, that you have to look at effect or you have to look at reductions, you have to look at how funds are reduced. But that, those elements did not trigger the requirements under 30A, assuming 30A applies at all under the facts of this case. But if we didn't accept, the district court gave a very particular interpretation of 30A, which is that only actions of the State itself could trigger a cost study. Right. If one, certainly if we conclude as a matter of law that, in fact, other things could trigger a cost study, that is to say where the payments are affected by something external, there may be instances in which that would trigger a cost study. Well, we Obviously, that would, I mean, that would be an issue of law, if we thought her interpretation of law was wrong. I think her decision was much narrower. Her decision basically looked at the express language of 30A to say that methods and procedures relating to the payment for care and services assume that payments are consistent with the efficiency, economy, and quality of care, which she found specifically was that the 4% rollback that was negotiated in the Massachusetts case did not relate to methods and procedures that was provided under the State of California, because we already had an existing method and procedure. And that's the State's reliance on the AWP. That I reject the argument that, in fact, Ninth Circuit case law is broader than what the judge applied, which is to say that it is dealing with the net, the payments, regardless whether the payments will accomplish the purposes of the statute and not necessarily the methodology of the payment. Well, I think there's the opponents make a very broad reading of Ninth Circuit law, and I think it's manifestly incorrect. The Lydia Dominguez case is not controlling. It does not apply in this case because, in effect, Governor Schwarzenegger signed a legislative enactment into law placing a cap on the amount of monies available to the counties, which very directly affected the amount of salaries for in-home health care providers. That trigger, we made the argument as the State of California that, well, we didn't exactly set rates in that case, but the Ninth Circuit disagreed and said, well, if you change the statute, if you change the method of reimbursement to the counties, it's going to have a direct effect on salaries. And that was the trigger where, and that was what the Ninth Circuit keyed on. In this case, however, there isn't anything that the state did that would trigger its responsibilities under 30A. If the 30A, the 4% rollback was as a result of a settlement agreement in which the pharmacists had inflated their costs in order to defraud the public, in a manner of speaking, of benefits that they were not entitled to. You look at the court decisions in these cases, and they said the rollback was perfectly reasonable and rational under the circumstances and appropriate because this was an attempt to alleviate the overinflation of costs that was benefiting the pharmacists for so long. So what if First Data Bank had lowered the AWP to one-half of WAC? Do you have a 30A problem? Whatever First Data Bank does, we are tied to the dilemma with using the AWP formula that the state of California uses. It's one of three. We have 22 other states that apply the same formula. We have no control over how First Data Bank computates its AWPs. And it's- But you could control whether or not you rely on that formula. In other words, if the formula, for a variety of reasons, external to California's own policies, results in rates that don't bear a reasonable relationship to efficient and economic hospital costs, et cetera, bears on equal access issues. In other words, even if it's external, you have an option of changing the formula or the source of the formula. Well, I think it would have to be- it would have to require a change in the formula itself that would probably trigger a notice requirement. For example, when the state of California changed the formula from the cost minus 17%, say from 10% to 70%, it went through the notice process in order to comply with the Medicaid requirements. Now, if the state of California does something like that, it would be an obligation to provide a notice, not necessarily the 30A requirements because we still contend the 30A shouldn't apply under those circumstances. But there may be a notice requirement, and the state of California has done that in the past. But in this particular case, though, the 4% rollback was an attempt to level to- how should the court put it? To roll back the unlawful benefits that the pharmaceuticals had been receiving in the past. It only makes sense, and it's made sense to all the courts. And all the courts- But that's a little bit of overstatement. I mean, the only thing that was litigated was some 1,400 codes, 1,442 drug codes that were at issue in the Massachusetts case. And then First Data Bank reduced another 18,000, which had not been an issue and which may not have been collusive. In other words, the findings were much more limited than what you're describing. Maybe, but I think it's, at least to a large extent, the reason why the RICO action was filed, the reason why the U.S. Attorney's Office is here today to argue on behalf of the state of California that what the 4% rollback doesn't trigger a 30A requirement is because you have a third-party source, for example, such as First Data Bank who comes up with these figures of cost, and there's no way to monitor it unless a vendor or a purchaser or consumer brings an action, such as the RICO action as they did in Massachusetts, to ensure that the costs reflect reality. And so there's a kind of policing that occurs under these circumstances, but I think that there has been a problem over a number of years with the Pharmacists Association because they've reaped substantial unjustified benefits by raising these particular rates at their whim. And the courts have had a problem with trying to discern what costs actually consist of. And if you look at even this case out of the state of Washington, the courts are at a loss as to how it is that the pharmacists can come up with these cost estimates because there's no particular formula that anybody uses to say, well, what is the actual cost of this particular drug, and how in the process of going from manufacturer or the producer to the wholesaler to the pharmacist to the consumer, how all that fits in to a determination of what costs consist of. But we've relied for the last 20 years or so on First Data Bank or these vendors to come up with a list of these cost estimates, and that's how we make a determination on reimbursements. But that doesn't necessarily require a 30-A study every time that fluctuates. And it's never been prior to filing this action, subject to litigation, whenever the AWP rises or lowers, it's never been a contention by the Pharmacists Association that somehow a 30-A or that we have to conduct a study. It wouldn't make any sense. That's an argument the U.S. Attorney's Office said that certainly isn't the intent of Congress, and certainly it is not the intent of the federal government to require the states to do a study every time there's a change in the AWP. That's just not the way it's supposed to work. Okay. Thank you. Thank you, Your Honor. We'll hear from the United States. Thank you, Your Honor. May it please the Court, Daniel Lenners for the United States as amicus in this case. The United States participated as amicus in this case to address two issues raised by the plaintiffs below. The first is whether HHS regulations required the State of California to submit a state plan amendment for approval by HHS under the circumstances at issue here. And the second is whether the plaintiffs are likely to succeed on their argument that the State of California's plan doesn't comply with Section 30A and that the State of California was required to undergo cost studies prior to using the new prices being now published by First Data Bank. On the first issue, the interpretation of HHS's regulation, the regulation makes clear that state plan amendments are only required to be submitted to HHS for approval when those amendments are necessary to reflect certain conditions such as a change in federal law or regulations. Here there was no change to California's state Medicaid plan. It remains that pharmacies are reimbursed for the drugs at issue here at average wholesale price minus 17 percent, and therefore no state plan amendment was necessary. Well, let me ask you a question. Suppose market conditions change dramatically and the state plan falls out of compliance with 30A. You say in your brief HHS will withhold federal funding. Would you agree that if the AWP mysteriously collapsed and heaven forbid HHS was asleep at the switch, the courts could step in and enforce 30A? Or are you saying that HHS is the only backstop that there is? It's our position that when there's been no change to a state plan, when there's been no change to its methods or procedures, that it's HHS's responsibility to govern state compliance with Section 30A. And so if, in fact, market conditions change such that pharmacies believe they were being undercompensated and might have to pull out of the state Medicaid plan, that it is HHS's responsibility under those circumstances to enforce Section 30A through, for example, cutting reimbursement to the states or through threatening to reduce the federal government's payments to states until the state brings its payments to pharmacies that are in compliance. I have difficulty understanding if answers. Judge Nelson asked you a straight out question. He said if this, then the answer is that. But I have difficulty understanding the question. So let me try to rephrase what I think is Judge Nelson's question in a way to avoid the if. Is there an enforcement mechanism other than what the HHS does? HHS can always do what it can do to withhold funds or whatever. Is there a private enforcement action available at all in a situation where there is a threatened violation of Section 30? The answer is no, if the state plan has not changed. You're putting the if at the end. I'm sorry. This Court's precedent in Orthopedic Hospital makes clear that when states are changing their methods or procedures, when they're rate-setting, that organizations like the pharmacists. Okay, fair enough. So when there is a change in the formula, then we have case law that says there's a private type of action. Correct. And the position of the United States is when there's no change in formula, even if for whatever external factors the pharmacists are going out of business, they can't provide services, people are having difficulty finding a pharmacy that will fill Medicaid prescription. That's not the Court's business. That's something that the only sanction available is HHS withholding funds. That was my question. And the answer is yes, Your Honor. It's the United States' position that under that latter circumstance, it is HHS's responsibility, as envisioned by Congress, by giving HHS enforcement powers under 1396C, withhold payments, and to... But saying it's its responsibility isn't quite the same as saying it has a sole authority. It may be responsible for doing that, but that doesn't preclude a lawsuit. What you're saying is a little more than that. Not only is it their responsibility, but that is the sole recourse. Yes, Your Honor, that's the United States' position. Because we don't think, as plaintiffs have tried to claim, that their theory here is limited to circumstances like this. On taking it to its logical conclusion, the plaintiff's position is that pharmacy groups, hospitals, any time they believe a state has fallen out of compliance with Section 30A as a substantive matter can bring a lawsuit. And as the district court in Washington recognized, that would lead to... Because these groups, for any reason, whether it's First Data Bank has changed its formula, whether oil prices have increased and now pharmacies say that it costs more to ship the drugs to them, any sort of market condition change, the pharmacies could use as a basis, or the hospitals, or anyone receiving Medicaid reimbursement could use as a basis... I'm sorry? Rents shoot up. Rents, so the space they rent for the pharmacy is much more expensive, or labor costs go up. Exactly right, Your Honor. Anything related to the pharmacies or any Medicaid providers' costs would change. Then they could come in under Section 30A and say... Advertising costs increase. There's an infinite number of costs. And it's the United States' position that under those circumstances it is not only HHS's role, but solely HHS's providence to monitor states' compliance with Section 30A.  Thank you, Your Honor. Thank you. Thank you for coming out from Washington, D.C. to help us. Thank you, Your Honor. I wanted to make a couple quick points. First off, pharmacies had nothing to do with setting rates or AWP. That is set by First Data Bank and is set by the pharmaceutical providers. So it's incorrect for the state to come up here and say... How do you distinguish your case from the case where all of a sudden there's a sharp increase in labor costs and the pharmacies say, you know, the formula's working fine, but now I've got these external factors and we're losing money? Well, labor costs are covered by something else, Your Honor. Those are covered by the dispensing fee, which we've demonstrated in our papers has been substantially underpaid for a number of years anyway. And the way I distinguish this case, though, Your Honor... Okay, so electricity, lights in stores and rental, you know, just fine. The way I distinguish... I'm sorry, Your Honor. Yeah, all of a sudden, you know, the real estate market has boomed suddenly and there's not enough rental space and so rents have shot up and the pharmacies come in and show that there's been a 15% increase in rent. I distinguish it in several ways, Your Honor. First off, this was a change that occurred at a specific period of time on September 26, 2009, which everybody knew was going to happen, which every other third-party payer other than the state adjusted how they were going to be in payment because they recognized the problem that it was going to cause in reimbursement to pharmacies and they wanted to assure that people remained in their program. Secondly, Your Honor, with regard to electricity, that is totally out of the state's control. This is not a case where it's out of the state's control. The state chose to use First Data Bank and contracted away its responsibilities or is saying that it can contract away its responsibilities. I'm sorry. It has a contract with Data Bank? Well, it uses First Data Bank. It uses a third-party provider to define what average wholesale price is. But it had done that for years, that there had been notice with respect to that formula, and there's no issue about it. It's now because of external factors like those Judge Kaczynski is describing that that approved formula is problematic to your clients. Well, it's not the formula that's problematic, Your Honor. It's the payments that are problematic. And that's what this Court has consistently said. But a payment focus would be the kind of – would raise the kind of issues that the U.S. just raised, which is if you focus on the reasonableness of the payments, does that now subsume within it any market changes along the lines that Judge Kaczynski describes that would then trigger a study? Not market changes, Your Honor. This was not a market change. But with regard to the focus on payments, this Court has consistently said, it said in California Pharmacy Association, too, that payments are what matter, and italicized the word payments because it's what's critical. It also said with regard to the plain language of the statute, and I'm going to quote from the Court in California Pharmacy Association, slip opinion 3343, looking at the clear language in the statute, we noted that Section 38 provides that payments for services must be consistent with efficiency, economy, and quality of care, and that those payments must be sufficient enough to enlist providers. So if – let me just sort of back off a little bit. If there was an injunction that kept California from reducing its reimbursement payments, wouldn't that be tantamount to an order that the formula is amended so that now the reimbursement would be at 8 – this is my law court's calculation, I have no idea – 86.5 of AWP rather than 83% of AWP? In other words, to not implement this reimbursement formula that now changed because of First Data Bank settlement would change the percentages of the reimbursement formula, the existing percentages, and wouldn't that trigger notice of requirements, et cetera? Well, Your Honor, that's what this Court did with the 10% change, the 5% change. It said you cannot reduce payments until you've done these studies. If they want to – if they want to rely on First Data Bank, and they want to continue with the formula that they're using, but because it involved a material reduction in payments on September 26, 2009, they have a responsibility before they implement those changes to assure that they've done the proper studies as required under this Court. And you make it – so you're drawing a distinction between market forces over which the State has no control and might trigger a review process before HHS and this settlement situation. That's correct, Your Honor. And I point – I would point this Court to the Salazar versus – and I see I'm out of time if I can finish answering Your Honor's question. I point this Court to the district court in Salazar versus District of Columbia in a very similar case where the District of Columbia had contracted out to a third party to determine what were eligibility factors under the Medicaid Act for determining whether somebody was eligible to receive certain services under the Act. When you say contracted, do you mean contracted or do you mean quasi-contracted? Quasi-contracted. They relied on them, Your Honor. And the district – How is it different than relying on the standard force or the consumer's price index or all – I mean, contracts always – or frequently use third party indexing as a means of setting rates. Very often, like, rents will be set at the consumer price index. Well, I think that – Your Honor, but that's exactly the point here. They can't do that and then wash their hands of responsibility. If you take the State's argument to the absurd – Why not? I'm sorry. Why not? Because if you take the State's argument to the absurd, as I believe Judge Nelson was pushing it, they can set their reimbursement based on whatever First Data Bank says, average wholesale prices, even if it's – even if First Data Bank randomly alters its formula or uses the price of tea in China for determining what average wholesale prices. And, Your Honor, in two years – See, that's a decision you make at the time you set the formula and you choose First Data Bank. And then people like you can come along and say, no, no, no, they're the kind of company that uses the roulette wheel to set these prices or dartboard, and therefore they ought not to be reliable. But that ship has left. Well, no, it hasn't, Your Honor, because at the time when they began – Back? Exactly, Your Honor. At the time that they selected First Data Bank, they were using a formula that was 1.25 times wholesale acquisition costs, and now they're using a formula that is 1.20 times wholesale acquisition costs. See, I don't get it. It turns out your clients got this windfall for years and years because First Data Bank was cheating in your clients' favor. Instead of saying, boy, are we glad that they're not coming up to us for the difference in the past, they're now complaining about the future. Because now they're really using the correct prices. First off, Your Honor, I want to make two points on that. The settlement involved drug products from 2003. In 2004, the State of California made a substantial reduction in how it was calculating reimbursement. It went from – it reduced its AWP – it reduced the percentage that was knocking off of AWP.  And Judge Serris made no findings that there was unjust enrichment or that my clients were receiving unjust money because that would be a state-by-state analysis. And the First Circuit went on to say that no court should be fooled by these arguments of the state – by the arguments of the state that pharmacies were somehow unjustly enriched in the past. Because if you look at the history, and we pointed out the history to the district court, and it's in the – the history is a constant reduction in the mark-off of AWP in the most recent one occurring in 2004, where they went from, if I remember correctly, AWP minus 10 percent to AWP minus 17 percent. Okay. Thank you. All right, cases, I argue, will stand submitted. We are adjourned.
judges: Gertner, Kozinski, Nelson D. W.